KARGO, INC., ACK VENTURE HOLDINGS, : 
LLC, and UNITED MOBILE TECHNOLOGIES, :     05 Civ. 10528 (CSH) (DFE)
LLC, :
                Plaintiffs, :
:
    -against- :
:
PEGASO PCS, S.A. DE C.V., PEGASO :     MEMORANDUM OPINION
TELECOMUNICACIONES, S.A. DE C.V., :          AND ORDER
TELEFONICA MOVILES MEXICO, S.A. DE :
C.V., TELEFONICA MOVILES, S.A., and :
TELEFONICA S.A., :
                Defendants. :
------------------------------------------------------------- x

HAIGHT, Senior District Judge:

    In this diversity action, plaintiff Kargo, Inc. ("Kargo") alleges that defendant Pegaso PCS, S.A. de C.V. ("Pegaso") breached a contractual agreement by terminating their business relationship without paying a "termination without cause" fee specified in the contract. Alternatively, Kargo asserts equitable claims against Pegaso based on quantum meruit, promissory estoppel, and equitable estoppel. In addition, Kargo claims that defendants Pegaso Telecomunicaciones, S.A. de C.V. ("Pegaso Telecomunicaciones"), Telefonica Moviles Mexico, S.A. de C.V. ("Moviles Mexico"), Telefonica Moviles, S.A. ("Telefonica Moviles"), and Telefonica S.A. ("Telefonica") (collectively, "the Telefonica Defendants") tortiously interfered with Kargo's contract and business relationship with Pegaso.

    Several motions are pending before this Court. Kargo has moved for partial summary judgment on liability on its breach of contract and intentional interference with contractual relations claims. Pegaso and the Telefonica Defendants have filed cross-motions for summary judgment. This Opinion resolves the Telefonica Defendants' motion for summary judgment.

# I. BACKGROUND

**A.      The Parties**

Plaintiff Kargo is a corporation organized under the laws of Delaware, with its principal place of business in New York City. Kargo developed Internet-based messaging software and hosting services that enable cellular phone customers to send and receive mobile text messages. Kargo provided software and hosting services from its servers located in New York City. (Plaintiffs ACK Venture Holdings, LLC and United Mobile Technologies, LLC are assignees of Kargo's legal claims in this case.)

Defendant Pegaso is a Mexican corporation, based in Mexico City, Mexico, which provides cellular services throughout Mexico. Defendant Pegaso Telecomunicaciones is a Mexican corporation, based in Mexico City, Mexico, which is a holding company for Pegaso (and several related entities). Defendant Telefonica is a Spanish corporation, with its principal place of business in Madrid, Spain. Telefonica owns significant interests in a number of subsidiary corporations engaged in the telecommunications business. Telefonica Moviles is a Spanish corporation with its principal place of business in Madrid, Spain. Telefonica Moviles acquired Pegaso Telecomunicaciones (and Pegaso) in 2002. Defendant Moviles Mexico is a Mexican corporation with its headquarters in Mexico City, Mexico.

**B.      Factual Summary**

In the summer of 2001, Harry Kargman, the President and CEO of Kargo, traveled to Mexico and met with employees of Pegaso, which was interested in providing text messaging services for its cell phone customers. Kargo subsequently integrated its software into Pegaso's network systems and website, and began providing messaging services for Pegaso in December 2001.

During the first several months of 2002, Pegaso and Kargo negotiated over a Software License and Hosting Agreement ("the Agreement") to govern Kargo's provision of text messaging services for Pegaso.[1] The parties vigorously dispute whether a final agreement was reached. Kargo claims that the Agreement was finalized shortly after April 23, 2002. Pegaso asserts that the Agreement was never approved by its legal department, and that it never signed the contract. For present purposes, I need not resolve this dispute; it will suffice to note several provisions in the Agreement. First, the Agreement specified a three-year term. *See* the Agreement, § 7.1 ("The initial term of this Agreement shall commence on the Effective Date [April 25, 2002] stated in the first paragraph above and shall continue for a period of thirty-six (36) months thereafter."). Second, the Agreement included an early termination provision:

> **Effect of Breach of Termination Without Cause by Licensee.** Early termination of the Agreement as a result of Licensee's breach or a termination without cause by Licensee or any successor in interest of Licensee shall not relieve Licensee or such successor of the obligation to pay the greater of (i) all fees payable to Licensor, as described in Exhibit B, as would have been payable if the Agreement had continued for the full three (3) year term; or (ii) an early termination fee of (x) US two hundred thousand dollars (USD $200,000) if such termination occurs during the first twelve (12) months of the initial term, (y) US one hundred and fifty thousand dollars (USD $150,000) if such termination occurs during the second twelve (12) months of the initial term, or (z) US one hundred thousand dollars (USD $100,000) if such termination occurs during the last twelve (12) months of the initial term. The parties acknowledge that such early termination fees represent the fair market value of the costs incurred by Licensor in reliance on Licensee's covenants hereunder.

The Agreement, § 7.6.

Meanwhile, in March 2002 Telefonica Moviles announced that it was going to acquire

---

[1] I refer to the alleged contract as "the Agreement" purely for the sake of convenience. Such terminology does not reflect any opinion as to whether the alleged contract was actually finalized and agreed to by the parties.

Pegaso. On April 26, 2002, Telefonica Moviles entered into a Stock Purchase Agreement ("SPA") for the purchase of Pegaso. In May 2002, Luis Jorge Romero, a Telefonica Moviles employee, was assigned to Mexico City to help facilitate Pegaso's transition into Telefonica Moviles. He remained in Mexico for approximately ten months. The parties dispute the precise nature of Romero's powers and responsibility during this period. Kargo claims that Romero exerted managerial control over Pegaso's operations; the Telefonica Defendants contend that Romero's role was simply to gather information about Pegaso's operations and plan for the future.

In July 2002, Pegaso sent a revised draft of the Agreement to Kargo. The revised agreement eliminated the termination without cause fee and instead allowed Pegaso to terminate services (upon thirty days' written notice) without any penalty. Kargo claims that this was an attempt to "renegotiate" the Agreement, while defendants maintain that the prior Agreement had never been finalized.

Telefonica Moviles's purchase of Pegaso closed in September 2002.

On September 26, 2002, Pegaso informed Kargo that it had decided to discontinue the text messaging services provided by Kargo, effective September 30, 2002. Kargo claims that this decision was made by Romero of Telefonica Moviles (after Telefonica Moviles had decided to convert Pegaso from a CDMA-based network to a GSM-based network).[2] Romero states that he viewed sending text messages directly through a mobile telecommunications network as more efficient than through Kargo's Internet-based software, and that this was the reason Pegaso decided to stop using Kargo's services. Romero Decl., dated Nov. 8, 2007, ¶ 3.

---

[2] There are two main competing network technologies for cellular service: Code Division Multiple Access (CDMA) and Global System for Mobile Communications (GSM).

In an October 26, 2002 letter to Pegaso, Kargo confirmed that it had discontinued the text messaging services as requested but claimed that, pursuant to Section 7.6 of the Agreement, Pegaso owed Kargo $112.6 million.[3] Kargo reiterated this claim on November 4, 2002. On January 21, 2003, Kargo sent a "ten day demand" letter to Pegaso seeking the termination without cause fee.

In a February 4, 2003 letter, Pegaso rejected Kargo's termination without cause claim. The letter, which was signed by Romero (and apparently drafted by Telefonica Moviles or Moviles Mexico lawyers), stated:

> While Pegaso fully intends to continue complying with obligations it incurred prior to the acquisition, a review of Pegaso's files concerning its relationship with Kargo does not indicate that a binding agreement ever existed between the two companies. Therefore, we cannot at this time agree with your conclusion that Pegaso owes Kargo $112,587,384 for its alleged early termination of a contract. Therefore, Pegaso must reject your demand at this time.

Roover Aff., dated Oct. 15, 2007, Ex. 69.[4]

## C. Pending Motions

Kargo has moved for partial summary judgment on liability on its breach of contract and intentional interference with contractual relations claims. Pegaso and the Telefonica Defendants have filed cross-motions for summary judgment. The Telefonica Defendants' motion for summary judgment argues: (1) that this Court lacks personal jurisdiction over them, (2) that the exercise of

---

[3] Under Section 7.6, for an early termination without cause during the first year of services, Pegaso owed Kargo *the greater of*: (1) fees that would have been payable to Kargo over the full three-year term, or (2) an early termination fee of $200,000. Kargo claimed that it would have been paid $112.6 million in fees (including monthly hosting fees and user-related fees) over the three years.

[4] The letter added: "However, if you are in possession of any additional documentation which in your opinion evidences a binding agreement between Kargo and Pegaso, we will gladly review the same and reconsider our decision if necessary." *Id.*

such jurisdiction would violate due process, and (3) that, even if jurisdiction were proper, plaintiffs cannot in any event prove tortious interference with contract or tortious interference with economic advantage by the Telefonica Defendants. This Opinion resolves the Telefonica Defendants' motion.

## II. DISCUSSION

### A. Personal Jurisdiction

#### 1. Standard of Review

In a diversity action, personal jurisdiction is governed by the law of the forum state—in this case, New York. *See Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223 (2d Cir.1963) (en banc). The plaintiff "has the ultimate burden of establishing jurisdiction over defendant by a preponderance of the evidence," *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 364-65 (2d Cir. 1986) (citation omitted), but prior to an evidentiary hearing "the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir.1999) (citations omitted). Where as here, the parties have conducted extensive jurisdictional discovery but no evidentiary hearing has been held, "the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Bank Brussels*, 171 F.3d at 784 (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.1996)).

#### 2. General Jurisdiction Under C.P.L.R. § 301

New York's general jurisdiction statute, N.Y. C.P.L.R. § 301, allows a New York court to exercise personal jurisdiction over a foreign corporation—on *any* cause of action—when the

defendant "is engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." *McGowan v. Smith*, 52 N.Y.2d 268, 272 (1981) (citations omitted). The test for "doing business" is "a simple [and] pragmatic one," *Bryant v. Finnish Nat'l Airline*, 15 N.Y.2d 426, 432 (1965), which looks to whether the defendant is "present" in New York "not occasionally or casually, but with a fair measure of permanence and continuity," *Tauza v. Susquehanna Coal Corp.*, 220 N.Y. 259, 267 (1917). Relevant factors include: "the existence of an office in New York; the solicitation of business in the state; the presence of bank accounts and other property in the state; and the presence of employees of the foreign defendant in the state." *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir. 1985).

Plaintiffs contend that this Court has personal jurisdiction over the Telefonica Defendants pursuant to § 301 based on the following allegations. First, Kargo asserts that the Telefonica Defendants maintained executive offices in New York. But while Telefonica signed a lease for a New York office in 1999, it executed a sublease and surrendered the office in 2001. *See* Roover Aff., dated Nov. 15, 2007, Ex. 4. The "personal jurisdiction analysis looks to see whether the defendant was 'present' in New York at the time of the filing of the complaint," *Ginsberg v. Gov't Props. Trust, Inc.*, 2007 WL 2981683, at *6 (S.D.N.Y. Oct. 10, 2007), and a defendant's prior contacts with New York are "generally considered only to establish the pattern of contacts that existed at the moment the complaint was filed," *Schenker v. Assicurazioni Generali S.p.A., Consol.*, 2002 WL 1560788, at *4 (S.D.N.Y. July 15, 2002). Because Telefonica relinquished the office four years before plaintiffs filed their complaint in 2005, this allegation does not support the exercise of general jurisdiction over the Telefonica Defendants.

Second, plaintiffs assert that the Telefonica Defendants have hired attorneys, accountants,

and business advisors in New York. But the defendants' retention of services from New York-based firms—as opposed to defendants' own provision of goods or services (to customers) in or from New York—does not show that defendants were "doing business" in New York. *See in re Ski Train Fire in Kaprun, Austria*, 2003 WL 1807148, at *5 (S.D.N.Y. Apr. 4, 2003) ("Nor will the retention of advisors or counsel in New York to assist with these transactions suffice to subject AHP to general jurisdiction in New York."); *Bush v. Stern Bros. & Co.*, 524 F. Supp. 12, 14 (S.D.N.Y.1981) ("The location in New York of firms, such as law firms and investment services, which perform services for [defendant] for a fee[,] does not represent activity by [defendant] in New York for jurisdictional purposes.").

Third, plaintiffs assert that the Telefonica Defendants listed American Depository Receipts ("ADRs") on the New York Stock Exchange and maintained related depository accounts. A foreign corporation's "list[ing] [of] securities on New York-based stock exchanges" (and related activities undertaken to maintain that listing) are relevant to the jurisdictional analysis; but, "without more, [such contacts] are insufficient to confer jurisdiction." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 97 (2d Cir. 2000).

Fourth, plaintiffs assert that Telefonica Moviles instituted a lawsuit in the New York courts. However, that case—*Telefonica Moviles Puerto Rico, Inc. v. ClearComm, L.P.*, No. 07 Civ. 361 (S.D.N.Y.)—was commenced *after* Kargo filed this lawsuit. Because the "personal jurisdiction analysis looks to see whether the defendant was 'present' in New York at the time of the filing of the complaint," *Ginsberg,* 2007 WL 2981683, at *6, a later-filed lawsuit cannot establish jurisdiction at the time Kargo filed its complaint.

Fifth, plaintiffs assert that the Telefonica Defendants entered into contracts that selected New

York as the venue for dispute resolution and invoked New York law. Such contractual provisions only very weakly—if at all—demonstrate that the Telefonica Defendants were "present" or "doing business" in New York.[5]

In addition, plaintiffs do not contest that the Telefonica Defendants did not have any employees based in New York, did not sell any products or services within New York, did not direct advertisements to New York, and did not have a phone number in New York at the time this lawsuit was filed.

Taking all of these factors into account, I conclude that plaintiffs fall well short of making a prima facie showing of general jurisdiction over the Telefonica Defendants. The allegations set forth by Kargo plainly fail to establish that the Telefonica Defendants were engaged in a "continuous and systematic course" of "doing business" in New York at the time this lawsuit was filed.

### 3. Specific Jurisdiction Under C.P.L.R. § 302(a)(3)(ii)

The New York "long-arm" statute permits a court to exercise personal jurisdiction over a foreign defendant for a specific cause of action arising out of, *inter alia*, the defendant "commit[ting] a tortious act without the state causing injury to person or property within the state," where the defendant "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." C.P.L.R. § 302(a)(3)(ii). To

---

[5] Plaintiffs also claim that Telefonica does business in New York because it has several subsidiaries licensed to do business in New York, including Telefonica Larga Distancia de Puerto Rico, Inc., Telefonica Data USA, Inc., and Telefonica Internacional USA, Inc. But "it is well settled that the mere presence of a parent's subsidiary in New York does not subject the parent to personal jurisdiction in the state." *Ginsberg,* 2007 WL 2981683, at *7. The acts of the subsidiary cannot be attributed to the parent for jurisdictional purposes unless the subsidiary is an "agent" or "mere department" of the parent. *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998). Plaintiffs do not even attempt to make such a showing for these subsidiaries.

9

determine whether there is injury in New York, courts "generally apply a situs-of-injury test, which asks them to locate the original event which caused the injury." *Bank Brussels*, 171 F.3d at 791 (internal quotations and citation omitted). "This 'original event' is, however, generally distinguished not only from the initial tort but also from the final economic injury and the felt consequences of the tort." *Id.* (citations omitted). The Second Circuit has held that "the 'original event' occurs 'where the first effect of the tort . . . that ultimately produced the final economic injury' is located." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84-85 (2d Cir. 2001) (quoting *Bank Brussels*, 171 F.3d at 792).

Section 302(a)(3) was originally developed in the context of physical injuries to individuals, *see Am. Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*, 439 F.2d 428, 432-33 n.4 (2d Cir. 1971); but the situs-of-injury analysis is also applied to commercial injuries, *see Sybron Corp. v. Wetzel*, 46 N.Y.2d 197, 205 (1978). In *Sybron*, the plaintiff, a New York corporation, alleged that defendant, a competitor corporation located in New Jersey, was engaging in unfair competition and misappropriating trade secrets by hiring plaintiff's former employee. The New York Court of Appeals found "injury in New York" under § 302(a)(3) where "the economic injury plaintiff seeks to avert stems from the threatened loss of important New York customers." *Id.* at 205 (plaintiff had contended that "should plaintiff's alleged trade secrets be disclosed [to the New Jersey competitor], [plaintiff's] business from New York sales could suffer significantly").

Kargo and the Telefonica Defendants dispute whether plaintiffs' tortious interference claims allege an injury in New York under § 302(a)(3). Kargo relies heavily on *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81 (2d Cir. 2001). In *DiStefano*, the plaintiff DiStefano, the former vice president for marketing and sales for the defendant corporation Carozzi, alleged that Carozzi had

10

unlawfully terminated his employment. Carozzi's principal place of business—including its only office and all its employees except plaintiff—was in Rhode Island, but DiStefano performed his duties from his New York office. DiStefano's employment was terminated at a meeting held in New Jersey. The district court held that the original event which caused the injury occurred in New Jersey, where the plaintiff's employment was terminated. The Second Circuit reversed. It held:

> [T]he execution of the decision to terminate DiStefano and the making of the decision itself constitute the "tortious act without the state" contemplated by the statute, and not the "original event which caused the injury" to DiStefano.
>
> Rather, the "original event" is DiStefano's experience of being removed from his job. Due to the nature of the relationship between DiStefano and Carozzi, in which DiStefano performed his employment duties in New York, DiStefano experienced the "first effect" of losing his job in New York, even though he was fired in New Jersey. Indeed, when a person is employed in New York (or performs a substantial part of the duties of his or her employment in New York), his or her removal from that employment (or from those duties) is a New York event that constitutes the "first effect of the tort" of discharging the employee. Therefore we hold that such a removal constitutes an "original event" occurring in New York which, together with DiStefano's in-state injury, satisfies the requirements of § 302(a)(3).

*DiStefano*, 286 F.3d at 85 (citation omitted). Kargo seeks to apply the same reasoning in this case. It argues: "Because Kargo performed its work in New York (and Pegaso utilized the KargoTM Software on the Kargo servers in New York), the 'original event' occurred in New York, satisfying C.P.L.R. § 302(a)(3)(ii)." Pls.' Opp'n Br. at 19-20.

But the *DiStefano* analysis—which identified the location of injury as the place where the employee performed his duties of employment—applied to an individual employee's unlawful termination claim; this case, in contrast, involves a company's claim of tortious interference causing commercial injury. In the latter context, most courts have identified the place of injury as where the plaintiff company lost business (and customers), not the location the company primarily operates out

11

of. In *(888) Justice, Inc. v. Just Enterprises, Inc.*, 2007 WL 2398504 (S.D.N.Y. Aug. 22, 2007), plaintiff operated a legal service referral business that licensed listings to lawyers in its cooperative advertising program, which featured (888)-JUSTICE as its telephone number. The defendant corporation operated a competing attorney referral business with the telephone number 1-800-JUSTICE. Plaintiff sued the defendant's intellectual property lawyers for tortious interference after those lawyers drafted and sent cease and desist letters to plaintiff's licensees in Georgia, Florida, and Michigan, which caused those licensees to sever their licenses with plaintiff. The court held:

> The initial tort would have been committed in Missouri where the drafting and sending of the C & D Letters took place. The "original event" that allegedly caused injury to Plaintiff took place in each state where the licensee, prompted by the C& D letters, resolved to sever its contractual relationship with Plaintiff. The first effect[s] of the C& D Letters were no doubt felt in those states, as the plaintiff's commercial relationships were severed there. It is the severance of contractual relationships in those states that ultimately leads to possible economic loss to Plaintiff. Therefore, for purposes of determining personal jurisdiction under Section 302(a)(3), the injury to Plaintiff by the tortious interference of the Martin defendants [the defendant corporation's intellectual property lawyers] occurred not in New York, but in states where its licensing relationships were allegedly damaged.

*Id.*, 2007 WL 2398504, at *4. *See also Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*, 2008 WL 852787, at *5, *6 (S.D.N.Y. Mar. 31, 2008) ("While . . . lost sales or customers can satisfy the 'injury within New York' requirement under Section 302(a)(3)(ii), those lost sales must be in the New York market, and those lost customers must be New York customers.") (finding no jurisdiction where plaintiff operated its business from New York but failed to "allege[] any injury in the form of decreased sales in the New York market or lost customers in the New York market"); *Commc'ns Partners Worldwide, Inc. v. Main Street Res.*, 2005 WL 1765712, at *6 (S.D.N.Y. July 26, 2005) (internal quotations and citation omitted) ("while the loss of customers in New York will satisfy the

local injury requirement, New York does not become the situs of the injury merely because the plaintiff is a domiciliary or resident of New York"); *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 568 (S.D.N.Y.2000) ("Injury within the state includes harm to a business in the New York market in the form of lost sales or customers. This rule is satisfied by Citigroup's claim that its actual and potential customers in New York are confused or deceived when they view and interact with the City National web sites."); *Cosmetech Int'l, LLC v. Der Kwei Enter. & Co.*, 943 F. Supp. 311, 319 (S.D.N.Y. 1996) ("the Second Circuit has recognized that, in locating the situs of a commercial injury, courts should look to where the plaintiff lost business"); *Sybron*, 46 N.Y.2d at 205 (finding jurisdiction where "the economic injury plaintiff seeks to avert stems from the threatened loss of important New York customers"); *Am. Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*, 439 F.2d 428, 432-35 (2d Cir. 1971) (identifying location of injury as place where plaintiff "lost business"; denying jurisdiction where plaintiff alleged that defendant damaged its business by stealing two customers outside of New York).[6]

In addition, where a plaintiff claims that defendant has improperly failed to pay fees for services rendered, the Second Circuit has held that the location of the injury is where the defendant withholds (or decides to withhold) payment from plaintiff, not where the plaintiff originally performed the services. In *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196 (2d Cir. 2001), the plaintiff, a New York lawyer, claimed that defendants had conspired to deprive him of his legal fees.

---

[6] Compare a recent unreported decision in which a lower New York court did apply the *DiStefano* analysis to a commercial injury, holding: "In a tortious interference with contract claim, the first effects are felt where the contract was to be performed by plaintiff, who was prevented from performing and reaping the benefits thereof." *Iconoclast Advisors LLC v. Petro-Suisse Ltd.*, 851 N.Y.S.2d 58, 2007 WL 2756959, at *8 (Sup. Ct. Sept. 20, 2007). This decision is in seeming conflict with the cases cited in text, which I follow in this opinion.

The court held:

> [Plaintiff] averred that ATI committed tortious conduct outside New York through conspiring with FTI to deprive him of legal fees, with the intent to economically injure him in New York. Further, he asserts that the original event giving rise to his claim of economic harm was his tendering of legal service to FTI in New York. Accepting these averments as true, they fail to serve as the basis for injury in New York and hence, jurisdiction under § 302(a)(3). As set forth above, the situs of injury for purposes of asserting long arm jurisdiction is the place where the underlying, original event occurred which caused the injury. The alleged injury here does not arise out of the legal services provided, but out of ATI's alleged failure to pay for such services. Accordingly, we agree with the district court that the relevant, original event which caused the initial injury was either the structuring of the partnership sale to avoid payment [to Whitaker] or the actual withholding of payment to Whitaker, both of which occurred outside New York.

*Id.* at 209 (internal quotations and citation omitted).

In this case, Kargo alleges that it was injured by the Telefonica Defendants when, as a result of tortious influence by the Telefonica Defendants, Pegaso terminated its business relationship with Kargo and refused to pay the termination without cause fee. I conclude that the "original events which caused injury" occurred in Mexico, where Pegaso decided to (and did) terminate its business relationship with Kargo, where Kargo "lost business" from a Mexican customer in the Mexican market (in which Kargo had been providing text messaging services for Mexican cell phone users), and where Pegaso decided to (and did) withhold payment of the termination without cause fee. Therefore, Kargo has failed to allege an injury in New York sufficient to authorize jurisdiction over the Telefonica Defendants under C.P.L.R. § 302(a)(3).

4.  **Specific Jurisdiction Under C.P.L.R. § 302(a)(1)**

The New York "long-arm" statute also permits a court to exercise personal jurisdiction over a foreign defendant for a specific cause of action arising out of the defendant "transact[ing] any

business within the state or contract[ing] anywhere to supply goods or services in the state." C.P.L.R. § 302(a)(1). This provision serves as the basis for personal jurisdiction over Pegaso, which transacted business in the state through its business dealings with Kargo. Plaintiffs claim that this provision also applies to the Telefonica Defendants because they essentially operated Pegaso during summer and fall of 2002, when Pegaso was in the process of becoming a subsidiary of Telefonica Moviles.

The acts of a subsidiary may be attributed to a parent corporation for jurisdictional purposes when the subsidiary is an "agent" or "mere department" of the parent. *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998). In determining whether the subsidiary is a "mere department" of the parent, the court must consider four factors: (1) common ownership; (2) financial dependency of the subsidiary on the parent; (3) the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities; and (4) the degree of control by the parent over the marketing and operational policies of the subsidiary. *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120-22 (2d Cir. 1984). The first factor is essential; if that requirement is met, the factors are then weighed to determine if the subsidiary should be treated as a separate and independent entity from the parent. *Id.*

In this case, the first requirement is met because Pegaso was a subsidiary of Telefonica Moviles. Plaintiffs make no allegation that Pegaso was financially dependent on the Telefonica Defendants. However, with regard to the third and fourth factors, plaintiffs allege that Romero, the Telefonica Moviles employee assigned to Mexico City in May 2002 to help facilitate the Pegaso's transition into Telefonica Moviles, played a significant role in managing Pegaso's operations—and

in particular, Pegaso's business dealings with Kargo. Certain parts of the factual record provide some support for this assertion. First, in a September 19, 2002 e-mail exchange between Kargo and Pegaso about the appropriate number of website "hits" (from customers using the text messaging services) to be used in calculating an invoice payment, Marco Antonio Ramos, a Pegaso employee, wrote: "But lets talk to Luis Jorge [Romero] these week, he is going to answer us all our doubts, and then we can talk about invoice, contract, etc... so I am not processing the invoice payment until we clarify these with Luis Jorge . . ." Roover Aff., dated Oct. 15, 2007, Ex. 62. Second, Ramos stated in his deposition testimony that Romero instructed Pegaso to turn off (or cancel) the text messaging services provided by Kargo. *Id.*, Ex. 8, at 90-91. Third, after Kargo submitted its termination without cause claim to Pegaso for payment of $112.6 million, Romero signed the letter from Pegaso (on Pegaso letterhead) rejecting that claim. *Id.*, Ex. 69. These facts suggest that Romero of Telefonica Moviles exercised a significant degree of managerial control over Pegaso's business dealings with Kargo.[7]

While the Telefonica Defendants dispute the plaintiffs' characterization of Romero's powers over Pegaso and allege that he played a far more limited role, I conclude that at this stage of the proceedings—prior to an evidentiary hearing or trial on the issue—Kargo has made a sufficient prima facie showing that Pegaso was "mere department" of Telefonica Moviles, and that Telefonica Moviles is thus subject to personal jurisdiction in this Court pursuant to C.P.L.R. § 302(a)(1) by virtue of Pegaso's business dealings with Kargo in the summer and fall of 2002. However, Kargo

---

[7] Kargo also notes that the SPA created a Pegaso-Telefonica "Transition Committee," which included four persons (including a Telefonica employee) appointed by Telefonica Moviles. The Transition Committee had the right to make recommendations to Pegaso executives, but such recommendations were non-binding. *See* Roover Aff., dated Oct. 15, 2007, Ex. 35, at 52.

has not sufficiently established that Pegaso was a "mere department" of any of the other Telefonica Defendants. The claims against those defendants—Pegaso Telecomunicaciones, Moviles Mexico, and Telefonica—must be dismissed for lack of personal jurisdiction.

### 4. Due Process

Having found a statutory basis for personal jurisdiction over Telefonica Moviles, the Court must determine whether such an exercise of jurisdiction comports with the constitutional guarantee of due process. The requirements of due process are met only if the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Where specific jurisdiction is asserted, the analysis looks to whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities" in the forum state such that "it should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985) (citations omitted).

At this stage of the proceedings, plaintiffs have sufficiently alleged that Pegaso was a "mere department" of Telefonica Moviles during summer and fall of 2002, and thus Pegaso's business dealings with Kargo may be attributed to Telefonica Moviles for jurisdictional purposes. Those business dealings with a New York-based company constitute sufficient contacts that could reasonably cause Pegaso (and Telefonica Moviles) to be haled into court in New York. Thus, if Pegaso was a "mere department" of Telefonica Moviles, the exercise of personal jurisdiction over Telefonica Moviles would not offend standards of due process.

## B. Plaintiff's Tortious Interference Claims

The Telefonica Defendants argue that, even if they are subject to personal jurisdiction in this

Court, summary judgment should be granted dismissing plaintiffs' claims for tortious interference with Kargo's contractual and business relations with Pegaso because plaintiffs cannot prove the elements of that tort. I agree.

The elements of a claim for tortious interference with contract are "the existence of a valid contract with a third party, defendant's knowledge of that contract, defendant's intentional and improper procuring of a breach, and damages." *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (2007). Liability for tortious interference with prospective business advantage requires "more culpable conduct on the part of the interferer," *id.* at 425-26 (citation omitted), which includes "wrongful means." *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.*, 87 N.Y.2d 614, 622 (1996).

Both types of tortious interference claims are subject to an "economic interest defense" if the defendant "acted to protect its own legal or financial stake in the breaching party's business"; and such a defense has been applied "where defendant and the breaching party had a subsidiary-parent relationship." *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (2007); *WMW Machinery Co. v. Koerber AG*, 658 N.Y.S.2d 385, 386 (App. Div. 2d Dep't 1997). That defense plainly applies in this case because Telefonica Moviles had an economic interest in Pegaso, its subsidiary. Indeed, if Pegaso was a "mere department" of Telefonica Moviles—as plaintiffs assert and the Court has accepted at this stage—then Telefonica Moviles clearly had a right to be involved in Pegaso's business decisions.

"The imposition of liability in spite of an economic interest defense requires a showing either of malice on the one hand, or fraudulent or illegal means on the other." *WMW Machinery Co.,* 658 N.Y.S.2d at 386 (citations omitted). Plaintiffs fail to make any such showing in this case. Plaintiffs

18

claim that the Telefonica Defendants improperly obtained Kargo's intellectual property without following the terms of the Agreement, but this allegation simply reiterates plaintiffs' breach of contract theory and has nothing to do with the means by which Telefonica Moviles caused Pegaso to terminate the contract or business relationship.[8] Nothing in the factual record suggests that Telefonica Moviles directed Pegaso to end its business relationship with Kargo in a malicious, fraudulent, or illegal manner, or that such action was taken for any reason other than ordinary business considerations—related to Telefonica Moviles' decision to use a GSM-based network rather than a CDMA-based network in Mexico and its decision to have text messages sent directly through a mobile telecommunications network rather than through an Internet-based software such as Kargo's. I conclude that there is no genuine issue of material fact as to whether Telefonica Moviles tortiously interfered with Kargo's contract or business relations with Pegaso, and Telefonica Moviles is entitled to summary judgment on those claims.

## III. CONCLUSION

For the above reasons, the claims against Pegaso Telecomunicaciones, Moviles Mexico, and Telefonica are dismissed for lack of personal jurisdiction. Telefonica Moviles's motion for summary judgment on plaintiffs' claims of tortious interference with contract and tortious interference with prospective business advantage is granted, and those claims are dismissed.

---

[8] Plaintiffs cite *CBS Corp. v. Dumsday*, 702 N.Y.S.2d 248 (App. Div. 1st Dep't 2002), for the proposition that interference based on use of plaintiff's proprietary material is by improper means. In *CBS Corp.,* the individual defendants were former employees of the plaintiff company who allegedly used confidential information from their prior employment—including cost and pricing details—to induce a client of the plaintiff to replace the plaintiff with a new company that the defendants had started. Those facts bear absolutely no resemblance to the case at hand.

It is SO ORDERED.

Dated: New York, New York
       July 28, 2008

/s/ Charles S. Haight
CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE