UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

KARGO, INC., ACK VENTURE HOLDINGS,  :
LLC, and UNITED MOBILE TECHNOLOGIES,  :     05 Civ. 10528 (CSH) (DFE)
LLC,  :

               Plaintiffs,  :

       -against-  :

PEGASO PCS, S.A. DE C.V., PEGASO  :     MEMORANDUM OPINION
TELECOMUNICACIONES, S.A. DE C.V.,  :     AND ORDER
TELEFONICA MOVILES MEXICO, S.A. DE  :
C.V., TELEFONICA MOVILES, S.A., and  :
TELEFONICA S.A.,  :

               Defendants.  :

------------------------------------------------------------ x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/14/08

HAIGHT, Senior District Judge:

In this diversity action, plaintiff Kargo, Inc. and its assignees (hereinafter in singular form "Kargo") alleges that defendant Pegaso PCS, S.A. de C.V. ("Pegaso") breached a contractual agreement by terminating their business relationship without cause, prior to completion of the three-year term of the agreement, and without paying a "termination without cause" fee specified in the contract. Alternatively, Kargo asserts equitable claims against Pegaso based on *quantum meruit*, promissory estoppel, and equitable estoppel. Kargo also claimed that defendant Pegaso Telecomunicaciones, S.A. de C.V. ("Pegaso Telecomunicaciones") and defendants Telefonica Moviles Mexico, S.A. de C.V. ("Moviles Mexico"), Telefonica Moviles, S.A. ("Telefonica Moviles"), and Telefonica S.A. ("Telefonica") (collectively, "the Telefonica Defendants") tortiously interfered with Kargo's contract and business relationship with Pegaso. In an earlier Opinion, reported at 2008 WL 2930546 (S.D.N.Y. July 29, 2008), this Court dismissed plaintiffs' claims against the Telefonica Defendants. The Court now addresses Kargo's motion for partial summary judgment on liability on its breach of contract claims, and Pegaso's cross-motion for summary

judgment on all the claims against it.

# I. BACKGROUND

## A. Factual Summary

Plaintiff Kargo is a corporation organized under the laws of Delaware, with its principal place of business in New York City. Kargo developed Internet-based messaging software and hosting services that enable cellular phone customers to send and receive mobile text messages. Kargo provided software and hosting services from its servers located in New York City.

Defendant Pegaso is a Mexican corporation, based in Mexico City, Mexico, which provides cellular services throughout Mexico. Telefonica Moviles, a Spanish corporation engaged in the telecommunications business, acquired Pegaso in 2002.

In the summer of 2001, Harry Kargman, the President and CEO of Kargo, traveled to Mexico to solicit business. During this trip, Kargman met with employees of Pegaso, which was interested in providing text messaging services for its cell phone customers. After further discussions between Kargman and Alexandra Betancur, a Pegaso employee, Kargo integrated its software into Pegaso's network systems and website, and began providing messaging services for Pegaso in December 2001.

During December 2001, an "Agreement to Provide Services" was drafted, which set forth the scope of services to be provided by Kargo as well as pricing terms. The Agreement to Provide Services was intended to be a short-term arrangement that would be replaced by a long-term contract between the parties. However, the Agreement to Provide Services was never finalized or signed by the parties, as negotiations turned instead to a longer-term arrangement.

2

During the first several months of 2002, Pegaso and Kargo negotiated over and exchanged drafts of a "Software License and Hosting Agreement" ("the Agreement")[1] to govern Kargo's provision of text messaging services for Pegaso.[2]

At the end of March 2002, a final agreement had not been reached. On March 31, 2002, Kargo submitted to Pegaso an invoice (Invoice No. 331021) in the amount of $53,870.95, which included software integration fees and monthly hosting fees. According to Kargman, Betancur informed Kargo that Pegaso could not pay the invoice until the Agreement was finalized.

On April 22, 2002, the parties were still negotiating the terms of the Agreement, including the provision involving an early termination penalty. On April 23, 2002, the parties held a telephone conference to discuss the contract. The participants in the telephone conference were: Kargman; John Manopoli, a lawyer representing Kargo; Betancur; and Jaime Chavez, a manager in Pegaso's Corporate Contracts Department. Manopoli asserts that a Pegaso attorney also participated in the call, although he could not remember that person's name; Pegaso contends that no Pegaso lawyer ever had discussions with Manopoli. According to Kargo, during the telephone conference, "Kargo and Pegaso, and their respective legal counsel, resolved all outstanding issues, and approved the final form of the Agreement." Pls.' Br. at 14.

This Agreement set forth numerous terms and conditions relating to Kargo's licensing of its

---

[1] As in the Court's prior opinion, the text of this opinion refers to the "Software License and Hosting Agreement" as "the Agreement" solely for the sake of convenience. The phrase should not be read to reflect the Court's view as to whether the alleged contract was actually finalized and agreed to by the parties. That question is addressed in the text of this opinion.

[2] During the same period, Kargo also negotiated and performed a World Cup promotion for Pegaso, using Kargo's phone messaging technology. This World Cup project was treated as a separate project.

messaging software and provision of messaging services to Pegaso. I quote two provisions particularly relevant to the present dispute. First, the Agreement specified a three-year term. *See* the Agreement, § 7.1 ("The initial term of this Agreement shall commence on the Effective Date [April 25, 2002] stated in the first paragraph above and shall continue for a period of thirty-six (36) months thereafter."). Second, the Agreement included an early termination penalty:

> **Effect of Breach of Termination Without Cause by Licensee.** Early termination of the Agreement as a result of Licensee's breach or a termination without cause by Licensee or any successor in interest of Licensee shall not relieve Licensee or such successor of the obligation to pay the greater of (I) all fees payable to Licensor, as described in Exhibit B, as would have been payable if the Agreement had continued for the full three (3) year term; or (ii) an early termination fee of (x) US two hundred thousand dollars (USD $200,000) if such termination occurs during the first twelve (12) months of the initial term, (y) US one hundred and fifty thousand dollars (USD $150,000) if such termination occurs during the second twelve (12) months of the initial term, or (z) US one hundred thousand dollars (USD $100,000) if such termination occurs during the last twelve (12) months of the initial term. The parties acknowledge that such early termination fees represent the fair market value of the costs incurred by Licensor in reliance on Licensee's covenants hereunder.

Agreement, § 7.6.

On April 24, 2002, the day after the telephone conference between the parties which allegedly "resolved all outstanding issues," Kargman initialed the back of each page of the Agreement, signed it, and sent it to Pegaso via Airborne courier. Kargman's cover letter to Pegaso's Chavez stated:

> I am glad that we were able to resolve all our issues today. Enclosed you will find two copies of the contract with my signature already on them. Please keep one copy for your records and send back the other copy through FEDEX or other traceable courier service.
>
> Once the contract is signed, please send me an email with confirmation. I am headed off on my Honeymoon on Saturday and I am feeling a lot of pressure

to have this signed. . . .

Gottehrer Decl., dated Nov. 15, 2007, Ex. 33. Pegaso received the document on April 25, 2002.

After Pegaso received the Agreement, three Pegaso employees—Betancur, Chavez, and Alejandro Orvañanos, Pegaso's Chief Commercial Officer[3]—reviewed it and signed or initialed in the margins of each page. The Agreement was then passed along to Pegaso's legal department around May 3, 2002.[4] The Agreement includes a signature line for Alfonso Sepulveda, Legal Director of Pegaso, on behalf of Pegaso. According to Pamela Santander Bermudez ("Santander"), a Pegaso attorney who assisted Sepulveda, Santander and Sepulveda reviewed the Agreement and found the early termination provision unacceptable. Sepulveda did not sign the Agreement; and a signed Agreement was never sent back to Kargo.[5]

Meanwhile, in March 2002, Telefonica Moviles had announced that it was going to acquire Pegaso. On April 26, 2002, Telefonica Moviles entered into a Stock Purchase Agreement ("SPA")

---

[3] Plaintiffs claim that Orvañanos was actually Pegaso's President, largely based on the deposition of Pamela Santander Bermudez, a Pegaso house attorney further identified in text, in which she initially identified Orvañanos as President but later corrected her testimony and explained that she had mistakenly referred to Alejandro Orvañanos as President instead of Alejandro Diez Barroso, the actual President. *See* Santander Decl. dated Nov. 9, 2007, Ex. 1 at 30, 63-66. The Stock Purchase Agreement between Pegaso and Telefonica Moviles, which sets forth the Board of Directors and Officers of Pegaso, clearly identifies Diez Barroso as Pegaso's President, and Orvañanos as Chief Commercial Officer. Roover Aff., Ex. 35 at D01465.

[4] On May 3, 2002, Kargo employee Federico Kattan sent an e-mail to Kargman, with the subject heading "Contract Signed!!," which stated: "I just talked to Alex [Betancur], Alejandro already signed the contract, now it's in legal and it's expected to be all over today. She will send email and a confirmation fax!!." Gottehrer Decl., Ex. 15. However, Betancur did not follow up with an e-mail or fax confirming that the Agreement had been approved by Pegaso's legal department.

[5] The Agreement initialed by the Pegaso employees was never sent to Kargo; it was obtained by plaintiffs in discovery.

5

for the purchase of Pegaso. The SPA included a disclosure schedule of "Material Contracts" "to which each Pegaso entity is a party or by which it or its assets may be bound"; and states that "each Material Contract is a valid and binding agreement of such Pegaso Entity that is a party thereto . . . . " Roover Aff., 2007, Ex. 35, SPA § 3.16. The disclosure schedule lists the three-year "Software Hosting and Licensing Agreement" with Kargo, with a "possible" signature date of April 20, 2002. The SPA is signed by a representative on behalf of Pegaso.

On May 14, 2002, Pegaso paid Kargo's March 31, 2002 invoice in the amount of \$53,870.05. In connection with this payment, Pegaso created an internal "Request for Payment" form, also dated May 14, 2002. The form includes a section that asks whether the requested payment is supported by a contract, and offers a box for "yes" and a box for "no." For the May 14, 2002 payment form, the "yes" box is checked, but there is a handwritten notation stating that the document is under revision ("contrato en revision"). The payment form is signed by various Pegaso employees.[6]

In a May 16, 2002 e-mail to an investor, Kargman wrote that "while we have not signed our agreement with Pegaso/Telefonica, we did start to get paid by them . . . ." Gottehrer Decl., Ex. 17. Kargman continued to seek a signed contract from Pegaso. In a May 27, 2002 e-mail to Betancur, Kargman wrote: "Please ask Alejandro if we can get the contract signed this week." Gottehrer Decl., Ex. 16. Betancur responded that the lawyers were still working on the contract (with Telefonica representatives).

---

[6] On May 13, 2002, the day prior to the payment, Betancur e-mailed Kargman and stated: "I just feel a lot of pressure getting you what I have promised. It is not in my hands right now so I feel very frustrated to see all the work that we have done and no res[u]lts for you. I just went to see our cfo and he told me that everything is in place to make you a payment tomorrow." Gottehrer Decl., dated Nov. 15, 2007, Ex. 23.

Kargo submitted a June 25, 2002 invoice (Invoice No. 625021) charging $24,049.38 for monthly hosting services and for work on the separate project relating to the World Cup.

In July 2002, Betancur sent a revised draft of the Agreement to Kargo, reflecting what Betancur termed "new policies for contracts." The changes had been made by Santander. The revised draft eliminated the termination without cause fee and instead allowed Pegaso to terminate services (upon thirty days' written notice) without any penalty. Kargman characterized this as an attempt to renegotiate the agreement.

On August 1, 2002, Pegaso paid the June 25, 2002 invoice (Invoice No. 625021) from Kargo.

On September 18, 2002, Kargman e-mailed Pegaso and stated: "[W]e need to move forward on our contract and have it returned to us—as I understand it was already signed." Kargman also submitted a Kargo invoice to Pegaso (Invoice No. 918021) for $39,137.01, which included monthly hosting services, charges for messaging services based on the number of users and hits, as well as fees for the World Cup project.

On September 26, 2002, Pegaso informed Kargo that it had decided to discontinue the text messaging services provided by Kargo, effective September 30, 2002. Pegaso stated that it would not pay the user and hit fees in the September 18, 2002 invoice because a service agreement was never completed. According to the defendants, Pegaso decided to stop using Kargo's services because Pegaso and Telefonica Moviles viewed sending text messages directly through a mobile telecommunications network as more efficient than through Kargo's Internet-based software.

On October 17, 2002, Pegaso paid Kargo's September 18, 2002 invoice, except for the user and hit charges. The payment totaled $35,604.00 (out of the invoiced amount of $39,137.01).

7

In an October 26, 2002 letter to Pegaso, Kargo confirmed that it had discontinued the text messaging services as requested but claimed that, pursuant to Section 7.6 of the Agreement, Pegaso owed Kargo $112.6 million.[7] Kargo reiterated this claim on November 4, 2002. On January 21, 2003, Kargo sent a "ten day demand" letter to Pegaso seeking the termination without cause fee.

In a February 4, 2003 letter, Pegaso rejected Kargo's termination without cause claim. The letter stated:

> While Pegaso fully intends to continue complying with obligations it incurred prior to the acquisition, a review of Pegaso's files concerning its relationship with Kargo does not indicate that a binding agreement ever existed between the two companies. Therefore, we cannot at this time agree with your conclusion that Pegaso owes Kargo $112,587,384 for its alleged early termination of a contract. Therefore, Pegaso must reject your demand at this time.

Roover Aff., Ex. 69.[8]

## B.    Procedural History and Pending Motions

Kargo's complaint alleges claims against Pegaso based on breach of contract, breach of implied-in-fact contract and breach of the implied covenant of good faith and fair dealing, as well as claims based on quantum meruit, promissory estoppel, and equitable estoppel. The complaint

---

[7] Under Section 7.6, for an early termination without cause during the first year of services, Pegaso owed Kargo *the greater of*: (1) fees that would have been payable to Kargo over the full three-year term, or (2) an early termination fee of $200,000. Kargo claimed that it would have been paid $112.6 million in fees (including monthly hosting fees and user-related fees) over the three years.

[8] The letter added: "However, if you are in possession of any additional documentation which in your opinion evidences a binding agreement between Kargo and Pegaso, we will gladly review the same and reconsider our decision if necessary." *Id.* Kargo did not furnish any additional information.

also included claims against the Telefonica Defendants for tortious interference with contract and tortious interference with prospective economic advantage. This Court has dismissed the claims against the Telefonica Defendants. *See Kargo, Inc. v. Pegaso PCS, S.A. de C.V.*, 2008 WL 2930546 (S.D.N.Y. July 29, 2008).

Following extensive discovery, Kargo moves for partial summary judgment on Pegaso's liability for its breach of contract claims. Pegaso cross-moves for summary judgment on all of Kargo's claims against it. This Opinion resolves those cross-motions.

## II. DISCUSSION

### A. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. The substantive law governing the case will identify which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). New York law governs the present dispute.

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*,

373 F.3d 241, 244 (2d Cir. 2004). However, "mere conclusory allegations, speculation or conjecture" are insufficient for a non-moving party to resist summary judgment. *Cifarelli v. Vill. of Bablyon*, 93 F.3d 47, 51 (2d Cir.1996). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## B.     Breach of Contract

In its motion for partial summary judgment, Kargo contends that the overall facts and circumstances, including oral agreement and partial performance, clearly demonstrate that the parties entered into the Agreement, which was breached by Pegaso's early termination and refusal to pay the early termination penalty. On its cross-motion, Pegaso contends that plaintiffs' claims must fail for one essential reason: Pegaso never signed the Agreement.

### 1.     Statute of Frauds

Pegaso's motion papers rely primarily on the New York Statute of Frauds, which provides:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
> [] [b]y its terms is not to be performed within one year from the making thereof.

N.Y. Gen. Oblig. Law § 5-701(a)(1) (2006).[9] Pegaso argues that the New York Statute of Frauds applies because the contract specified a three-year term. Kargo claims that the Statute of Frauds is inapplicable because there was a possibility of performance within one year—because Pegaso could terminate the Agreement without cause within one year, so long as it paid the (very large)

---

[9] The parties agree that the substantive law of New York governs this diversity action.

10

termination fee specified in Section 7.6. The New York Court of Appeals has stated generally: "Where one or both parties have such an explicit option to terminate their agreement within one year, that agreement is, by its own terms, capable of completion within that period and is not governed by the Statute [of Frauds]." *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y.2d 449, 456 (1984).

However, Section 7.6 of the Agreement cannot fairly be regarded as an "option to terminate," a phrase implying an absolute right to terminate without payment or penalty. In contrast, Section 7.6 imposes an early termination penalty, in a very substantial amount, as reflected by Kargo's claim. I agree with Pegaso that if the parties had agreed upon a contract, the Statute of Frauds would apply to it.

Under New York law, the threshold requirements of the Statute of Frauds may be satisfied by a combination of signed and unsigned writings, where the signed writings evidence "a contractual relationship between the parties" and the various writings "clearly refer to the same subject matter or transaction." *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 55-56 (1953). In this case, Kargo contends that these requirements can be satisfied by the Agreement, the SPA (which includes the Agreement in its list of contracts, with "possible" signature date of April 20, 2002), and Pegaso's May 14, 2002 internal payment request form (which indicates that the payment is support by a contract, but also states that the agreement is "under revision").

But I need not further consider the Statute of Frauds because the parties' contentions about its applicability to and effect upon the case at bar obscure the underlying issue, amply revealed by the record: Whether there was a contract at all. Even assuming that the Statute's threshold requirement of a signed writing is satisfied in the manner suggested by Kargo, the fact remains that the Agreement itself was not signed by Pegaso, and quite apart from the Statute of Frauds, Kargo

11

must "show assent to the unsigned paper." *Crabtree*, 305 N.Y. at 56-57. The Statute of Frauds does not address that question: it asks whether an acknowledged contract is enforceable. For the reasons explained below, Kargo has failed to show that an acknowledged contract came into existence.

## 2. Whether the Agreement Required Formal Execution

Pegaso argues that Kargman "understood that his proposed contract required an authorized signature to become effective," but that the contract was never signed or executed by Pegaso. Pegaso Br. at 3. Regardless of whether the Statute of Frauds applies, the parties themselves may intend to be bound only upon formal signature of the written contract document. I conclude that was the case here, and therefore agree with Pegaso that the unsigned Agreement cannot be enforced.

Under New York law, "if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed." *Scheck v. Francis*, 26 N.Y.2d 466, 469-70 (1970). "On the other hand, where there is no understanding that an agreement should not be binding until reduced to writing and formally executed, and 'where all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement,' then an informal agreement can be binding even though the parties contemplate memorializing their contract in a formal document." *R.G. Group, Inc. v. Horn & Hadart Co.*, 751 F.2d 69, 74 (2d Cir. 1984) (citing and quoting *Mun. Consultants & Publishers, Inc. v. Town of Ramapo*, 47 N.Y.2d 144, 148-49 (1979)).

In *Scheck v. Francis*, the New York Court of Appeals analyzed a disputed employment contract between George Scheck and the popular singer Connie Francis. Scheck had been the personal manager for Francis for many years. About a year after an earlier employment agreement had expired, the parties entered into negotiations for a new contract. After a "final negotiation

12

session," Francis's attorney mailed Scheck four copies of the new agreement, with a cover letter requesting the plaintiff to "sign all copies" and "have Connie sign all copies." 26 N.Y.2d at 469. Scheck signed the agreements promptly, but Francis never signed them. Scheck continued to work for Francis for about four more months, at which point Francis's attorney informed Scheck that he was not to enter into further negotiations for services with Francis unless she notified him in writing to the contrary. After Scheck later sought certain compensation and accountings, he was advised by Francis's attorney that there were "no contracts in existence between (him) and our client." *Id.* The New York Court of Appeals applied the rule that "if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed"; and it ruled that the agreement was unenforceable because "[i]t appears quite clear, from [defendant's attorney's cover] letter alone, that the agreements were to take effect only after both parties had signed them." *Id.* at 469-70.

The determination of whether the parties intended to be bound prior to an executed, written agreement is based on "the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances," and "when a party gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent." *R.G. Group,* 751 F.2d 69 at 74-75). The Second Circuit has identified four factors relevant to the analysis: "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the [alleged] contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the alleged agreement at issue is the type of contract that is usually committed to writing." *Winston v. Mediafare*

*Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1980).[10] I consider each of these factors in turn.

As for the first factor, the correspondence between the parties and various provisions in the Agreement itself strongly indicate that the parties intended to be bound only upon signature of the agreement by both parties. In his correspondence with Pegaso, Kargman repeatedly stressed the importance of getting the contract signed. On March 10, 2002, Kargman sent Betancur a draft contract and said, "I hope we can quickly get it signed—this week." Gottehrer Decl., Ex. 3. In an April 1, 2002 e-mail to Betancur, Kargman stated that he planned to fly to Mexico to "get the deal finished," and "the main reason for my visit is to get this contract signed." Gottehrer Decl., Ex. 4. On April 18, 2002, Kargman sent another draft of the contract to Betancur for review, and offered to "Fedex this to you tonight with my signature and you can fedex it back on Monday with the completed contract." Gottehrer Decl., Ex. 5. On April 19, 2002, Kargman requested that lawyers review the contract quickly because he need to "send it [the contract] Fedex tonight at the latest to get it back signed next week." Gottehrer Decl., Ex. 6. On April 22, 2002, Kargman sent an e-mail to Betancur, which stated: "It seems as if you did not get the answers you needed today to have the contract signed. This is very worrisome. . . . I am leaving on my Honeymoon on Sunday and I cannot relax unless this contract is signed. We are at the breaking point with this process and we need to have the contract signed immediately . . . ." Gottehrer Decl., Ex. 8. On April 24, 2002, the day after the telephone conference between the parties which allegedly "resolved all outstanding issues," Kargman signed the Agreement and sent it to Pegaso. His cover letter accompanying the

---

[10] In practice, the first factor involves not only "express reservations" of a right not to be bound prior to the execution of a document, but also looks to whether correspondence (or other communication) between the parties and the language of the draft agreement indicate such an intent. *See, e.g., Winston*, 777 F.2d at 81-82.

signed Agreement stated:

> I am glad that we were able to resolve all our issues today. Enclosed you will find two copies of the contract with my signature already on them. Please keep one copy for your records and send back the other copy through FEDEX or other traceable courier service.
>
> Once the contract is signed, please send me an email with confirmation. I am headed off on my Honeymoon on Saturday and I am feeling a lot of pressure to have this signed. . . .

Gottehrer Reply Decl., Ex. 33. In a May 27, 2002 e-mail to Betancur, Kargman wrote: "Please ask

Alejandro if we can get the contract signed this week." Gottehrer Decl., Ex. 16. These

communications strongly indicate that the parties understood throughout the negotiating process that

the Agreement would not be binding until it was signed and executed by both parties.[11]

Various provisions in the Agreement itself further indicate that a formal, executed agreement

was required:

> **12.9 Amendment.** No change, amendment or modification of any provision of this Agreement shall be valid unless set forth in a written instrument duly executed by *both parties*. (emphasis added).
>
> **12.10 Entire Agreement.** This Agreement, including its Exhibits and Attachments, represents the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior and/or contemporaneous agreements and understandings, written or oral, between the parties with respect to the subject matter hereof. The terms and conditions of any present or future purchase order or invoice submitted by Licensor or Licensee that conflict with or in any way purport to amend or add to any other terms and conditions of this Agreement or any exhibit hereto shall be of no force or effect nor shall any such document govern in any way the subject matter

---

[11] Further evidence of the parties' understanding that the Agreement was a draft document that needed to be executed, rather than a memorialization of a prior oral agreement, is found in an e-mail from Manopoli, the Kargo attorney who helped prepare the Agreement, to Kargman. On May 2, 2002, *after* the April 23, 2002 telephone conference and Kargman's mailing of the signed document to Pegaso, Manopoli asked Kargman: "Have you heard anything from Pegaso on the latest draft?" Gottehrer Reply Decl., Ex. 23.

hereof, unless the same is expressly agreed to in writing and is executed by authorized representatives of *Licensor and Licensee*. (emphasis added).

**12.11 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document, and may be delivered to the other party by facsimile transmission of the *signature pages* hereto. (emphasis added).

**12.15 Full Power.** Licensor and Licensee each warrants to the other party that it has the full power to enter into and perform this Agreement, and the person signing this Agreement on *Licensor's and Licensee's* behalf has been duly authorized to enter into this Agreement. (emphasis added).

Finally, the Agreement states: "In WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above," and includes a signature line for Kargman, as President & CEO of Kargo, representing Kargo, and a signature line for Alfonso Sepulveda, Legal Director of Pegaso, representing Pegaso.

These repeated variations on the same theme demonstrate the parties' intent and understanding that the document was not merely memorializing a prior oral agreement, but rather that the Agreement needed to be formally executed by both parties to take effect. *See, e.g., R.G. Group,* 751 F.2d at 74 (clause stating "that any modification in the agreement would . . . have to be in writing and signed" indicated the parties did not intend to be bound prior to execution of the contract); *Ciaramella v. Reader's Digest Ass'n, Inc.,* 131 F.3d 320, 324 (2d Cir. 1997) ("The presence of such a merger clause [similar to § 12.10 in the Agreement] is persuasive evidence that the parties did not intend to be bound prior to the execution of a written agreement."). Therefore, the first factor strongly favors Pegaso.

As for the second factor, there was partial performance by both parties. Kargo had been performing messaging services, and Pegaso accepting that performance, since December 2001.

16

However, since Kargo had been performing (and Pegaso accepting performance) for many months prior to the alleged agreement in April or May of 2002, the fact that Kargo continued performing after that point does not strongly indicate the existence of an agreement. On May 14, 2002, Pegaso paid Kargo's March 31, 2002 invoice in the amount of $53,870.05. The internal "Request for Payment" form associated with this payment, dated May 14, 2002, has a box checked indicating that the request payment is supported by a contract, but there is a handwritten notation stating that the document is under revision ("contrato en revision"). However, any inference that this payment signaled that the contract was in effect (despite Pegaso's failure to execute the contract) is undermined by Betancur's e-mail to Kargman, dated May 13, 2002, which states: "I just feel a lot of pressure getting you what I have promised. It is not in my hands right now so I feel very frustrated to see all the work that we have done and no res[u]lts for you. I just went to see our cfo and he told me that everything is in place to make you a payment tomorrow." Gottehrer Reply Decl., Ex. 23. The clear import of this message is that Betancur helped arrange the May 14, 2002 invoice payment notwithstanding the fact that the parties had not yet entered into a binding contract.[12] Moreover, the second factor of partial performance is not dispositive, and in some cases it is given little weight. In *Scheck v. Francis*, 26 N.Y.2d 466, the New York Court of Appeals found a clear intent to be bound only by a signed contract despite the fact that the plaintiff Scheck had been working for the defendant Francis for a year after the expiration of the prior contract, and for an additional four months after the alleged new agreement. *See also Longo v. Shore & Reich, Ltd.*, 25 F.3d 94 (2d Cir.

---

[12] Betancur's May 13, 2002 e-mail also undermines Kargo's claim that the May 14, 2002 payment demonstrated the existence of a contract because of Pegaso's general practice of withholding payment until a contract was in place.

1994).[13]

As for the third factor, Kargo claims that the April 23, 2002 telephone conference "resolved all outstanding issues," leaving nothing further to be negotiated. However, Sepulveda and Santander, the legal team at Pegaso, had not yet reviewed the draft. Even if Kargo is correct that all issues were resolved *to the satisfaction of the participants in the April 3, 2000 conference call* (Betancur, Chavez, and, according to Manopoli, an unnamed attorney), Kargman was aware that further authorization was needed from a more senior Pegaso employee with authority to sign off on the contract. Although Kargman apparently anticipated that this authorization would be quickly given, nothing in the record precludes the possibility that more senior Pegaso employees would raise further issues. Which is precisely what came to pass: after Sepulveda and Santander reviewed the Agreement, Pegaso expressed opposition to the early termination penalty. In any event, although this factor (that there are essentially no further issues to negotiate) appears to be a prerequisite for enforcing an *unexecuted* contract pursuant to *Mun. Consultants & Publishers, Inc. v. Town of Ramapo*, 47 N.Y.2d 144, 148-49, its presence does not foreclose a holding that a proposed agreement

---

[13] The issue in *Longo* was whether plaintiff Kathryn Longo had entered into an enforceable contract to be Chief Operating Officer of the defendant company ("S & R"). After several draft employment contracts were negotiated and prepared (but not executed), Longo began working at S & R. Several days later, the general counsel of S & R's parent company sent Longo two unsigned copies of an employment agreement, and instructed her to sign both and pass them on to Gerald Reich, S & R's Chief Executive Officer, for his signature. Longo signed the agreement and forwarded it to Reich, who never signed it. Longo worked for S & R for three months (and was paid during that time based on her salary in the unsigned agreement). The Second Circuit concluded that the cover letter, like that in *Scheck,* "evidenced an intent that the parties would not be bound to the terms of their negotiations until the agreement was signed." 25 F.3d at 97. The court further held: "Nor can the facts that Longo began working at S & R and that S & R accepted her services override the expressed intention to be bound by the contract only upon signing by both parties." *Id.* The court indicated that this result was mandated by *Scheck*, where the New York Court of Appeals "refused to overlook the requirement of a signed contract for continued employment." *Id.*

18

is unenforceable because the parties did not intend to be bound until it was in writing and signed. The latter "rule holds even if the parties have orally agreed upon all the terms of the proposed contract." *R.G. Group*, 751 F.2d at 74 (citing *Schwartz v. Greenberg*, 304 N.Y. 250 (1952)). *See also Longo*, 25 F.3d 94 (agreement unenforceable without required signatures even though agreement had been fully negotiated).

The fourth factor looks to whether the "agreement concerns those complex and substantial business matters where requirements that contracts be in writing are the norm rather than the exception." *R.G. Group*, 751 F.2d at 76. The 25-page Agreement set forth numerous details about Kargo's licensing of its messaging technology and provision of messaging services to Pegaso. Moreover, Kargman's letters in late 2002 and early 2003 demanding payment of the early termination fee claimed that the Agreement would have resulted in $112.6 million in fees being paid to Kargo over the three-year term of the contract. "With that amount of money at stake, a requirement that the agreement be in writing and signed simply cannot be a surprise to anyone." *R.G. Group*, 751 F.2d at 77 (referring to transaction with initial investment of two million dollars and alleged lost income, profits, and injuries of at least eighty million dollars). This would be so even if Kargman's letters substantially overestimated the amount of fees that would be due throughout the term of the contract.

The Second Circuit has indicated that district courts should be cautious in granting summary judgment on the issue of whether parties intended not to be bound in the absence of a writing. *See Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 576 (2d Cir. 1993) (summary judgment inappropriate without "uncontroverted objective signs evincing an intent not to be bound"); *Babdo Sales, Inc. v. Miller-Wohl Co.*, 440 F.2d 962, 965 (2d Cir.1971). Nonetheless, summary judgment

19

on this issue is appropriate if "after pretrial discovery the court is convinced as a matter of law that the suit can have only one possible outcome." *R.G. Group*, 751 F.2d at 77 (affirming district court's granting of summary judgment because parties did not intend to be bound in the absence of a signed writing); *Longo*, 25 F.3d 94 (same).[14] This is such a case. Having considered the facts developed during comprehensive discovery and the relevant factors, I conclude that there is no genuine issue of fact as to whether the parties intended to be bound in the absence of an executed, written contract, signed by both parties. The undisputed facts—in particular, the correspondence between the parties and the language in the contract—clearly show that the Agreement was not binding until executed by both Kargo and Pegaso.

### 3.  Whether the Record Shows the Agreement was Executed by Both Parties

Having determined that the parties did not intend to be bound until the Agreement was executed, I turn to whether there is any genuine issue of fact as to whether the Agreement was fully executed.

Kargman signed the Agreement on April 24, 2002, and mailed it to Pegaso. The copies of the document produced by Pegaso demonstrate that three Pegaso employees—Betancur, Chavez, and Orvañanos—signed or initialed in the margins of each page of the document, but that neither Sepulveda nor any other Pegaso employee (besides Betancur, Chavez, and Orvañanos) ever signed the document. The signature line for Pegaso in each copy of the Agreement is blank. Gottehrer

---

[14] Although issues of "intent" are often left to the fact-finder at trial, I note that the analysis in the situation at hand turns on *objective* indications of the parties' intent, *R.G. Group*, 751 F.2d at 74-75, rather than an examination of the *subjective* state of mind of the parties based, for example, on after-the-fact testimony of the parties.

Decl., Ex. 13A-C.[15] Betancur and Chavez were not authorized to enter into contracts on behalf of Pegaso. Under the shareholder resolutions adopted by Pegaso and its affiliates on April 27, 2001, Orvañanos was given power of attorney to enter into agreements on behalf of Pegaso for contracts worth $250,000 or less. Roover Aff., Ex. 34 at D8357. Under the shareholder resolutions, the individuals authorized to enter into any contract on behalf of Pegaso were: Sepulveda, Chairman Alejandro Burillo Azcarraga, President Alejandro Diez Barroso, and General Director Juan Marco Gutierrez Wanless. The documents produced by Pegaso show that no one authorized to enter into the Agreement (which, according to Kargo, involved well more than $250,000) signed it; and the Pegaso signature line in the Agreement was not signed.

This explicit documentary evidence is not overcome by the circumstantial evidence Kargo offers in an effort to show that the Agreement was fully executed and a copy of the document countersigned by Pegaso has been withheld by Pegaso or its attorneys from Kargo. The SPA disclosure schedule of contracts includes the Agreement, and notes a "possible" signature date of April 20, 2002. But Kargman did not send the copy of the Agreement with his signature until April 24, 2002 (and it was not received by Pegaso until the following day). Thus, the SPA does not demonstrate that the Agreement was signed by Pegaso.

On May 3, 2002, Kargo employee Federico Kattan sent an e-mail to Kargman, with the subject heading "Contract Signed!!," which stated: "I just talked to Alex [Betancur], Alejandro already signed the contract, now it's in legal and it's expected to be all over today. She will send email and a confirmation fax!!." Gottehrer Decl., Ex. 15. For several reasons, this evidence is

---

[15] Santander declared that these copies of the original contract documents were kept in files maintained for the Kargo matter, and that she retrieved these documents at the request of counsel for the defendants in this lawsuit.

21

inadequate to demonstrate that the Agreement was duly executed. First, it is inadmissible hearsay: Kattan had no personal knowledge of the events described, which were observed by Betancur. In any event, the e-mail most likely reflects the fact that Alejandro Orvañanos had initialed the contract (as appears in the copies of the Agreement produced from Pegaso's files). But Orvañanos did not have authority to enter into contracts involving more than $250,000 (such as the contract here). Moreover, Kattan's e-mail itself indicates that the contract needed to be passed on to Pegaso's legal team, and that Betancur would send e-mail and a confirmation fax when the contract was fully executed. However, Betancur did not follow up with an e-mail or fax confirming that the Agreement had been approved by Pegaso' legal department.

The May 14, 2002 internal payment request form has a box checked indicating that the request payment is supported by a contract but also includes a handwritten notation stating that the document is under revision. Kargo argues that the checked box reflects a signed agreement, and that Pegaso's policy was to withhold payment until a signed agreement was reached. But these arguments are undermined by Betancur's May 13, 2002 e-mail to Kargman, previously discussed, which clearly indicates that Betancur was attempting to arrange payment of the invoice despite the fact that the contract had not yet been executed.[16]

Finally, Kargo refers to various e-mail exchanges between Kargman and Betancur (after Betancur had left her employment at Pegaso), in which Kargman asked Betancur to confirm his version of the business history between Kargo and Pegaso, including his claim that the Pegaso

---

[16] This understanding of the situation—payment of the invoice by Pegaso although the contract had not been signed—is reflected in Kargman's own May 16, 2002 e-mail to an investor, where he wrote that "while we have not signed our agreement with Pegaso/Telefonica, we did start to get paid by them . . . ." Gottehrer Decl., Ex. 17.

agreement had been signed. Betancur forwarded the message to Pegaso, and stated: "I cannot answer his [Kargman's] e-mail confirming what he says because I am not with Pegaso anymore. However, I can tell you that almost everything he states, if not everything, actually happened." Roover Aff., dated Oct. 15, 2007, Ex. 58. In a later text message exchange between Kargman and Betancur regarding his account of the business history between Kargo and Pegaso, Betancur wrote: "I said that everythi[n]g you wrote was how we negotiated." Roover Aff., Ex. 59. Betancur's communications, which only generally confirm Kargman's account of the negotiations between the parties, do not demonstrate that the contract was actually executed.

In sum, the circumstantial evidence relied upon by Kargo cannot overcome the clear documentary evidence from the actual copies of the Agreement produced by Pegaso, which shows that the Agreement was never signed by a duly authorized Pegaso employee, on the signature line or anywhere else. There is no genuine issue of fact on this question.

Because I conclude that the parties did not intend to be bound until the contract was executed and that the contract was never in fact executed, Pegaso's motion for summary judgment dismissing Kargo's breach of contract claims (Counts I and II of the Complaint) is granted.

## C.  Breach of Implied-in-Fact Contract

Kargo also alleges breach of an implied-in-fact contract, based on the parties' conduct rather than a written agreement. But "[a] contract may not be implied in fact from the conduct of the parties where it appears that they intended to be bound only by a formal written agreement." *Valentino v. Davis,* 270 A.D.2d 635, 638, 703 N.Y.S.2d 609, 612 (App. Div. 3d Dep't 2000). Because I conclude that the parties intended to be bound only by a formal written agreement, this cause of action (Count III of the Complaint) is dismissed.

23

## D. Breach of Implied Covenant of Good Faith and Fair Dealing

A claim for breach of the implied covenant of good faith and fair dealing is "dependent upon the existence of an enforceable contract." *United Magazine Co. v. Murdoch Magazines Distribution, Inc.*, 146 F. Supp. 2d 385, 405 (S.D.N.Y. 2001) (citation omitted). For the reasons explained above, the Agreement is not an enforceable contract. Accordingly, this cause of action (Count IV of the Complaint) is dismissed.

## E. *Quantum Meruit*

To recover in *quantum meruit* under New York law, a claimant must establish "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Longo*, 25 F.3d 94 (quoting *Bauman Assocs., Inc. v. H & M Int'l Transp., Inc.*, 171 A.D.2d 479, 484, 567 N.Y.S.2d 404, 408 (App. Div. 1st Dep't 1991)).

Kargo's provision of messaging services for Pegaso from December 2001 to September 2002, Pegaso's acceptance of those services, and the parties' negotiations over compensation for those services clearly satisfy the first three requirements. Pegaso contends that the fourth element cannot be met because Pegaso paid the Kargo invoices for services rendered. But this argument is contrary to the Second Circuit's holding in *Longo*. As described in note 13, *supra*, the Second Circuit held Longo's employment contract unenforceable, despite the fact that she worked for the company for three months after she signed the contract (and was paid based on the annual salary in the alleged contract), because defendant's representative never signed the contract as required. Longo sought alternative relief based on *quantum meruit*. The district court dismissed the claim, holding that Longo was entitled only to the "agreed upon" salary in the alleged contract, which she

24

received. The Second Circuit reversed that holding, finding under New York law that when a contract is unenforceable, the "defendant [is] precluded from relying upon that express contract to measure the plaintiff's recovery" and that the plaintiff is instead entitled to recover the "reasonable value of services rendered." *Longo*, 25 F.3d at 97 (quoting *Isaacs v. Incentive Systems, Inc.*, 52 A.D.2d 550, 382 N.Y.S.2d 69, 70 (App. Div. 1st Dep't 1976)). Thus, the Second Circuit held that Longo's *quantum meruit* claim could not be dismissed based on the fact that she had been paid at the salary specified in the alleged contract; rather, the court held that "[i]t remains for the factfinder to determine the reasonable value of her services, which may be more than, less than, or the same as the compensation she has already received." *Longo*, 25 F.3d at 98.

In this case, Kargo claims that the rates used in the invoices were well below the market value of the services rendered (and that these discounted rates were provided in the expectation of a long-term contract). Pegaso cannot rely upon the rates set forth in the unenforceable Agreement (and used in the invoices) to defeat Kargo's *quantum meruit* claim. Rather, Kargo is entitled to compensation for the "reasonable value" of its services, which "may be more than, less than, or the same as the compensation [Kargo] has already received." *Longo*, 25 F.3d at 98. Therefore, Pegaso's motion for summary judgment on Kargo's *quantum meruit* claim (Count V of the Complaint) is denied.

## F. Promissory and Equitable Estoppel

Under New York law, a claim for promissory estoppel requires "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance." *Ripple's of Clearview, Inc. v. Le Havre Assocs.*, 88 A.D.2d 120, 122, 452 N.Y.S.2d 447, 449 (1982). Equitable estoppel

25

is appropriate "where one party rightfully relies upon the word or deed of another party and in so relying, changes his position to his injury"; the required elements are: "(1) An act constituting a concealment of facts or a false misrepresentation; (2) An intention or expectation that such acts will be relied upon; (3) Actual or constructive knowledge of the true facts by the wrongdoer; (4) Reliance upon the misrepresentations which causes the innocent party to change its position to its substantial detriment." *Special Event Entm't v. Rockefeller Center, Inc.*, 458 F. Supp. 72, 76 (S.D.N.Y. 1978) (citations and internal quotation marks omitted).

In light of my finding that the parties intended to be bound only by an executed contract, these equitable doctrines can only be satisfied if Pegaso "clearly and unambiguously" promised or intentionally misrepresented that the contract had been executed. Kargo has not set forth sufficient evidence to create a genuine issue of fact on that question. Kargo employee Kattan's May 3, 2002 e-mail indicates that Betancur told him that "Alejandro" had signed the contract, that "it's in legal, and it's expected to be all over today." These latter statements indicate that the Pegaso legal department still needed to approve the contract, and that while its approval was "expected," the contract had not yet been executed. In any event, as noted *supra* Kattan's e-mail is inadmissible hearsay. During his deposition, Kargman admitted that he could not recall if Betancur ever told him that the contract had been signed. *See* Gottehrer Reply Decl., Ex. 5 at 214-15.[17] Furthermore, any claim that Pegaso promised or represented to Kargo that the contract had been executed in early May

---

[17] During the deposition, Pegaso's counsel asked Kargman: "[D]o you ever recall Alexandra Betancur saying to you, in a conversation . . . that the contract had been signed?" Kargman replied: "I don't recollect at this moment. . . . I would love to say I recollect having that conversation, but there is something in my mind that says we did have that conversation, but I cannot recollect it at this moment, so I have to be straightforward with you. I would love to say that, but I can't recollect it at this moment. So the answer is I don't know." *Id.*

is undermined by Kargman's May 16, 2002 e-mail to an investor, in which Kargman wrote that "we have not signed our agreement with Pegaso/Telefonica," and Kargman's May 27, 2002 e-mail to Betancur, in which Kargman requested: "Please ask Alejandro if we can get the contract signed this week." Gottehrer Decl., Ex. 16. The evidence set forth by Kargo is insufficient for a rational factfinder to conclude that Pegaso clearly and unambiguously promised or intentionally misrepresented that the contract had been executed. Thus, Pegaso is entitled to summary judgment dismissing Kargo's claims based on promissory estoppel and equitable estoppel (Counts VI and VII of the Complaint).

## G. Standing of Certain Plaintiffs

Pegaso asserts that neither Kargo nor plaintiff ACK Venture Holdings, LLC ("ACK") has standing to sue, because Kargo assigned its claims to ACK, and ACK assigned its claims to plaintiff United Mobile Technologies, LLC ("UMT"). *See James McKinney & Son, Inc. v. Lake Placid 1980 Olympic Games, Inc.*, 61 N.Y.2d 836, 838 (1980) (plaintiff that had assigned its interest was no longer the "real party in interest" and "therefore, had no right to maintain any of its claims"). Plaintiffs acknowledge that "Kargo's claims are now held solely by Plaintiff UMT." Pls.' Opp'n Br., at 25 n.20. Therefore, the claims of plaintiffs Kargo and ACK must be dismissed for lack of standing.

## III. CONCLUSION

For the foregoing reasons, the parties' cross-motions for summary judgment are decided as follows:

27

The motion of plaintiffs Kargo, Inc., ACK Venture Holdings, LLC and United Mobile Technologies, LLC for partial summary judgment on Counts I, II and III of their Complaint is DENIED.

The cross-motion of defendants Pegaso PCS, deC.V. and Pegaso Telecomunicaciones, S.A. de C.V. for summary judgment dismissing Counts I, II, III, IV, VI, and VII of the plaintiffs' Complaint is GRANTED.

Defendants' motion for summary judgment dismissing Count V of the Complaint is DENIED.

All claims asserted on behalf of plaintiffs Kargo, Inc. and ACK Venture Holdings, Inc. are DISMISSED for lack of standing.

It is SO ORDERED.[18]

---

[18] In moving for summary judgment on Kargo's breach of contract claims, the briefs for Pegaso relied principally upon the Statute of Frauds in contending that the Agreement was unenforceable. The briefs for Kargo contended that the requirements of the Statute were satisfied. The Court's grant of summary judgment to Pegaso on these claims is based, not on the Statute of Frauds, but on the legal principle that there is no enforceable contract until the contract is formally executed by both parties if the parties did not intend to be bound until that event occurred. The line of cases described and analyzed in Part II.B.2. of this opinion results from the Court's independent research. Those specific legal issues were not briefed by the parties, although the briefs of counsel extensively laid out and discussed the relevant facts. The Court is not thereby precluded from granting summary judgment on that ground. Just as the Court of Appeals "may affirm the District Court's order of summary judgmenton any ground that finds adequate support in the record" whether or not urged by the parties, *Savin Corp. v. Savin Group*, 391 F.3d 439, 450 (2d Cir. 2004) (citation omitted), a District Court may grant summary judgment on a ground not briefed by the parties where, as here, the record compels that result. Nonetheless, if plaintiff is advised to move for reconsideration of the motions, the Court will interpret Local Civil Rule 6.3 leniently. The Rule requires a movant to demonstrate material facts or controlling precedents that the Court overlooked in its prior opinion. The ground upon which summary judgment is granted in this case was overlooked by counsel, not the Court, and I think it fair to allow plaintiff, if so inclined, to submit a brief on a motion for reconsideration which addresses that ground. Such a motion must be filed and served within the time mandated

28

Dated: New York, New York
October 14, 2008

Charles S. Haight

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

---

by Rule 6.3. Defendants may file and serve opposing papers not later than ten (10) days
thereafter.

A second point: Some of the briefs and exhibits filed on these motions were designated as
confidential. The Court will file this Opinion under seal. Counsel are directed to advise the
Court by letter not later than 10 days after the date of the Opinion whether the parties wish to
preserve that sealed filing. Courts generally favor public filings, and so good cause for
preserving the seal must be made to appear.