UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

KARGO, INC., et al.,

    Plaintiffs,

v.

PEGASO PCS, S.A. DE C.V,
et al.,

    Defendants.

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-11-2009

05 Civ. 10528 (CSH) (DFE)

ECF Filed

**MEMORANDUM OPINION
AND ORDER**

**HAIGHT,** Senior District Judge:

    Plaintiff and defendant cross-move for reconsideration of the Court's Memorandum Opinion and Order dated October 14, 2008. This Opinion resolves both motions.

## I. BACKGROUND

    In this diversity action, plaintiff Kargo, Inc. and its assignees ("Kargo") alleged, *inter alia*, that defendant Pegaso PCS, S.A. de C.V. ("Pegaso") breached a contractual agreement by terminating their business relationship without cause, prior to completion of the three-year term of the agreement, and without paying the fee for that early termination contained in the contract. Kargo provides Internet-based messaging software and hosting services that enable cellular phone customers to send and receive mobile text messages. At the pertinent times Pegaso was a Mexican corporation providing cellular services throughout Mexico. The alleged contract upon which Kargo bases its action called for Kargo to furnish such services to Pegaso and Pegaso to pay Kargo fees for them.

1

Kargo's complaint against Pegaso included claims for breach of an agreed and binding contract between the parties, breach of an implied-in-fact contract, breach of the implied covenant of good faith and fair dealing, *quantum meruit*, promissory estoppel, and equitable estoppel. After extensive discovery, Kargo moved for partial summary judgment on liability on its breach of contract claims. Pegaso cross-moved for summary judgment dismissing all Kargo's claims against it.

The Court resolved those cross-motions in a Memorandum Opinion and Order reported at 2008 WL 4579758 (S.D.N.Y. Oct. 14, 2008) ("*Kargo I*"), familiarity with which is assumed. *Kargo I*, after describing the documentary and testimonial evidence at length, denied Kargo's motion for summary judgment on its breach of contract claims, and granted Pegaso's cross-motion to dismiss Kargo's claims against it, with the sole exception of Kargo's *quantum meruit* claim for services rendered prior to the complete severance of the parties' commercial relationship. *See* 2008 WL 4579758, at *14 (summarizing the Court's conclusions).

Kargo and Pegaso now cross-move for reconsideration under Local Civil Rule 6.3. Each party defends those holdings in *Kargo I* favorable to it and attacks those that are adverse.

## II. STANDARD OF REVIEW

In ordinary circumstances, a Rule 6.3 movant for reconsideration must satisfy stringent criteria. It is well settled that:

> Reconsideration of a previous order by the court is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources. The provision for reargument is not designed to allow wasteful repetition of arguments already briefed, considered and decided. The major grounds justifying reconsideration are an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice. To these ends, a request for reconsideration under Local Rule 6.3 must demonstrate controlling

2

> law or factual matters put before the court in its decision on the underlying matter that the movant believes the court overlooked and that might reasonably be expected to alter the conclusion reached by the court.

*Walsh v. WOR Radio*, 537 F.Supp.2d 553, 554 (S.D.N.Y. 2008) (citations and internal quotation marks omitted).

However, I prefaced this Part with the phrase "in ordinary circumstances." The circumstances in the case at bar are not ordinary, for the reasons stated in footnote 18, with which *Kargo I* concludes. 2008 WL 4579758, at *14 n. 18. With respect to the enforceability of the contract Kargo alleged in its complaint, the parties' briefs on the cross-motions for summary judgment focused principally upon the Statute of Frauds. However, the Court's granting of summary judgment to Pegaso dismissing those claims was based "not on the Statute of Frauds, but on the legal principle that there is no enforceable contract until the contract is formally executed by both parties if the parties did not intend to be bound until that event occurred," a conclusion I reached in *Kargo I* on the basis of "the Court's independent research" involving "specific legal issues [which] were not briefed by the parties." *Id.* The case fell outside the usual Rule 6.3 boundaries because "[t]he ground upon which summary judgment was granted in this case was overlooked by counsel, not by the Court," and I thought it fair "to allow plaintiff, if so inclined, to submit a brief on a motion for reconsideration which addresses that ground." *Id.*

Not surprisingly, plaintiff was so inclined. Plaintiff's briefs on its present motion for reconsideration acknowledge, as they must, that Pegaso never signed and returned a fully executed contract to Kargo, but cite cases for the proposition that the evidence compels a conclusion that the contract is enforceable nonetheless, or that at the very least the issue presents triable issues of fact

3

precluding summary judgment.

I give full consideration to those authorities and the contentions they are said to support, because I promised plaintiff Kargo to "interpret Local Civil Rule 6.3 leniently" in the rather different circumstances presented by the case. But plaintiff's newly cited cases must be considered in the context of the Court's analysis of the evidence in *Kargo I*,[1] unless Kargo can point to evidence the Court overlooked which materially alters the factual landscape. To that extent, the stringencies of Rule 6.3 practice remain.

### III. DISCUSSION

Kargo moves for reconsideration of *Kargo I* which, if granted, would restore its contract-based claims. Pegaso cross-moves for reconsideration which, if granted, would result in dismissal of Kargo's sole remaining claim, that for *quantum meruit*. I discuss these motions in turn.

#### A.    Kargo's Motion

Kargo makes two arguments: First, Kargo contends that a response by Pegaso to one of its Requests for Admission under Rule 36, Fed.R.Civ.P., conclusively establishes that a "written contract" existed between the parties. Kargo further contends that the evidence shows that written contract must be the Agreement containing the early termination fee, upon which Kargo bases its contract claims. Second, and quite apart from the Requests for Admission, Kargo asserts that "there is compelling and overwhelming evidence of Pegaso [*sic*] assent to the Agreement." Main Brief at 2.    Kargo's first contention is based on the proposition that a particular response by Pegaso to one of Kargo's Rule 36 Requests to Admit establishes absolutely and conclusively that the contract giving rise to its claims was entered into and is binding upon Pegaso. If that proposition is correct,

---

[1] *See Kargo I*, 2008 WL 4579758, at *1-*4.

4

Pegaso is precluded from contending that it never entered into a binding services contract with Kargo, and the Court's review of the evidence on that issue in *Kargo I* was unnecessary and inappropriate. But I do not accept Kargo's contention.

The response upon which Kargo relies was made by Pegaso to Kargo's Request to Admit No. 84 in its first set of Requests for Admissions under Rule 36. Pegaso's responses are dated July 25, 2007. Kargo's Request to Admit No. 84 reads:

> Admit that the Defendants possess no written contract that permitted any of them to use or benefit from Kargo proprietary software or trademarks.

Pegaso's Response to that Request reads:

> Pegaso objects to this request on grounds that it is vague, ambiguous and seeks irrelevant information. Subject to these objections, Pegaso denies that it did not have a "written contract" for the use of Kargo software.

On its present motion for reconsideration, Kargo dismisses Pegaso's objections to Request No. 84 as boilerplate, and proclaims a "Gotcha" moment in Pegaso's *denial* that it *did not have* a written contract for the use of Kargo software. Kargo asserts that Pegaso's use of a double negative constitutes an admission that it *did* have such a contract, which Kargo argues must be the one upon which it bases its claims.

If this were the only declaration by Pegaso during the preliminary skirmishing in the case, there might be some substance to Kargo's grammatical theory. However, in preparation for the cross-motions for summary judgment, the parties engaged in the mandated Local Civil Rule 56.1 practice. That rule requires a party moving for summary judgment to submit a "short and concise statement . . . of the material facts as to which the moving party contends there is no genuine issue

5

to be tried." The non-moving party must respond to a Rule 56.1 statement and indicate any disagreement with the moving party's factual assertions, failing which the facts will be deemed admitted for trial purposes.

In the case at bar, Kargo, as the moving party for partial summary judgment on liability on its breach of contract claims, included in ¶ 7 of its Rule 56.1 statement references to contract negotiations in October and December, 2001, between Kargo and Pegaso personnel, and then states:

> There were several drafts of the "Agreement to Provide Services." The "Agreement to Provide Services" set forth a "Scope of Services," pricing and other terms, and it included an Appendix entitled "Preliminary Project Task List." The "Agreement to Provide Services" further stated that "[t]his agreement is binding and will be replaced with a mutually agreed long term contract within 60 days of the acceptance of this contract," *i.e.*, by early February of 2002. As discussed below, the negotiation of the "Agreement to Provide Services" was superseded by the "long term contract," *i.e.*, the Agreement.[2]

Pegaso responded to this statement, as Rule 56.1 required. It did not agree with Kargo's assertions of fact. Pegaso's response to ¶ 7 reads in part:

> Defendants deny that the negotiations of the "Letter of Intent" or "Agreement to Provide Services" was superseded by negotiation of a long-term contract. . . . Defendants deny that there were more than two drafts of the Agreement to Provide Services, neither of which were approved or signed by Pegaso. Defendants deny that Pegaso ever completed, approved, or executed a three-year contract with Kargo. Defendants hereby incorporate this denial into every response relating to Plaintiffs' assertions regarding the so-called "Agreement" or its purported execution by Pegaso.

The denial by Pegaso that it entered into the long term, three year Kargo alleges in its

---

[2] I have omitted from this and subsequent quotations the references to evidentiary materials that Rule 56.1 requires. The "Agreement" referred to in the last sentence of Kargo's statement is the alleged contract upon which it bases its claims.

6

complaint runs like a leitmotiv through Pegaso's responses to the chronological narrative contained in Kargo's Rule 56.1 statement. *See, e.g.*, Pegaso's responses to Kargo's ¶ 12 ("Pegaso's commercial department was authorized to pay for a product trial without a formal contract," but "by late March and beyond, the proposed agreement was not yet completed."); ¶ 13 ("Pegaso and Kargo were not negotiating the final few unresolved terms of the draft contract by April 22, 2002. By that date, neither the Pegaso Vice President who needed to approve nor any Pegaso lawyer had even seen the draft agreement."); ¶ 16 ("The Pegaso personnel initialed the document in the margins as part of Pegaso's internal review process that preceded review by Pegaso lawyers. . . . Pegaso would not commit to any final agreement until after the review and approval of the draft contract by its lawyers" and "would not commit to a final agreement until after the draft agreement was reviewed, approved, and executed on the signature line by Legal Director Alfonso Sepulveda."); and ¶ 19 ("Pegaso never approved or executed the draft agreement.").

These responses by Pegaso to Kargo's Local Rule 56.1 statement are dated November 15, 2007, four months after Pegaso's responses to Kargo's Rule 36 Requests to Admit. The single Rule 36 response Kargo fastens upon cannot be read in isolation. It must instead be read together with and in the context of Pegaso's further declarations in its Rule 56.1 responses. That comprehensive reading justifies Pegaso's contentions that its Rule 36 admission "was merely that it had in its possession drafts of a 'written contract,'" and that "Pegaso has never admitted there was any binding contract executed by the parties"; on the contrary, Pegaso's "denial of the existence of a binding written agreement has been consistent throughout this litigation." Main Brief at 7.

In these circumstances, I conclude that Pegaso's response to Kargo's Request to Admit No. 84 does not conclusively establish what Pegaso has consistently denied, namely, the existence of that

7

binding contract between the parties Kargo alleges in its complaint and upon which its claims are based. Accordingly, Kargo's first argument in support of reconsideration is rejected.

Kargo's second argument is that the record shows Pegaso agreed to be bound by the Agreement even though it did not sign it. Footnote 18 in *Kargo I* allowed, nay invited, the parties to brief that question on a motion for reconsideration, and they have responded with a will. The briefs of counsel cite many cases in support of their side of the question, and seek to distinguish the cases cited in support of the other. The cited cases declare and apply to their particular factual circumstances well-established principles of contract law. However, applying the governing principle, "that there is no enforceable contract until the contract is formally executed by both parties *if the parties did not intend to be bound until that event occurred*" (quoting *Kargo I*, fn. 18, emphasis added), is fact-intensive. While I have reconsidered the evidence in this case in the light of the cases counsel cite, I adhere to the conclusion that the record makes plain Pegaso's intention not to be bound to a three-year service contract with Kargo until a responsible Pegaso officer had signed the contract, which never occurred.[3] What occurred was that mid-level commercial personnel in the Pegaso hierarchy signified their approval of a draft agreement, which was then submitted to the legal department to say "Yes" or "No." The legal department said "No," unless the early termination fee upon which Kargo bases its claim was eliminated. Lawyers can be like that. The late Whitney North Seymour, Sr. defined a lawyer as "a person professionally trained to think up three problems for every solution." Be that as it may, a Pegaso officer with the requisite authority never signed the

---

[3] I will contribute to the collection of cases cited in counsel's briefs a decision of this Court holding, in somewhat similar circumstances, that the parties did not intend to enter into a binding agreement unless it was in the form of a fully executed document. *McElroy v. Gemark Alloy Refining Corp.*, 592 F.Supp.2d 508 (S.D.N.Y. 2008).

8

Agreement containing the termination fee, and the record evidence does not allow a finding that Pegaso intended to be bound by such a contract without signing it.

For these reasons, Kargo's motion for reconsideration fails.

## B.   Pegaso's Cross-Motion

Pegaso's cross-motion prays for summary judgment dismissing Kargo's *quantum meruit* claim. That claim was the sole survivor of *Kargo I*; see 2008 WL 4579758, at *12-*13.

As a threshold matter, I reject Kargo's contention that the cross-motion is untimely under the ten-day provision in Local Civil Rule 6.3. Pegaso filed its cross-motion within ten days of Kargo's timely motion. Assuming without deciding that Pegaso's cross-motion did not comply with the Rule, I have discretion to consider the cross-motion on its merits, and exercise that discretion in Pegaso's favor, discerning no prejudice to Kargo (other than its thwarted preference that the cross-motion be precluded).

Pegaso bases its cross-motion on the proposition that "[t]here is no justification for permitting Kargo to pursue its *quantum meruit* claim as it has been fully paid for the reasonable value of the services it provided, as reflected in its own invoices." Main Brief at 11. *Kargo I* discussed some of these invoices and the payments Pegaso made in satisfaction of them, *see* 2008 WL 4579758, at *2-*4, but also noted Kargo's claim "that the rates used in the invoices were well below the market value of the services rendered (and that those discounted rates were provided in the expectation of a long-term contract)." *Id.*, at *13. *Kargo I* concluded that "Pegaso cannot rely upon the rates *set forth in the unenforceable Agreement(and used in the invoices)* to defeat Kargo's *quantum meruit* claim for the reasonable value of its services, which 'may be more than, less than, or the same as the compensation [Kargo] has already received." *Id.* (citing and quoting *Longo v.*

9

*Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir. 1994)) (emphasis added).

Pegaso's reconsideration motion argues that Kargo's invoiced charges for its services were based *not* upon the long-term Agreement, unenforceable because never fully executed, but rather upon "the preliminary Agreement to Provide Services (the 'Term Sheet') the parties exchanged in December 2001." Main Brief at 9. In other words, Pegaso contends that in *Kargo I* the Court overlooked the effect of the Term Sheet in allowing Kargo's *quantum meruit* claim to proceed. That is a sufficiently colorable argument to satisfy the threshold requirements of Rule 6.3. So the question arises: Is the argument sound?

It may be acknowledged that Kargo's *quantum meruit* claim does fit the classic mold of that equitable remedy. In the classic case, the plaintiff renders valuable services to the defendant. Defendant accepts plaintiff's services and benefits from them, but pays plaintiff nothing. Plaintiff sues defendant for a price plaintiff alleges defendant agreed to in an enforceable contract. The court concludes that there was no enforceable contract. That is fatal to plaintiff's claim at law for the contract price, but to prevent defendant's unjust enrichment, equity allows plaintiff a *quantum meruit* claim for the reasonable value of his services.[4] The case at bar does not fit that mold because during the period in question, defendant Pegaso did not pay plaintiff Kargo nothing, it paid it something. The question is whether the circumstances of those payments preclude Kargo's claim for *quantum meruit*.

To recap some of the evidence discussed in *Kargo I*: Kargo began providing messaging

---

[4] "Quantum meruit is still used today as an equitable remedy to provide restitution for unjust enrichment. It is often pleaded as an alternative claim in a breach-of-contract case so that the plaintiff can recover even if the contract is voided." *Black's Law Dictionary* (7th ed. 1999) at 1255. In Second Circuit parlance: "*Quantum meruit* is a doctrine of quasi-contract." *Longo*, 25 F.3d at 98.

10

services for Pegaso in December 2001. Pegaso notified Kargo that it would discontinue using Kargo's services effective September 30, 2002. During that period of time, Kargo submitted three invoices to Pegaso: No. 331021, dated March 31, 2002, in the amount of $53,870.95; No. 625021, dated June 25, 2002, in the amount of $24,049.83; and No. 918021, dated September 19, 2002, in the amount of $35,604.00.[5] Pegaso paid all these invoices.

The amounts charged were derived from the "Term Sheet" to which Pegaso's brief refers, incorporated in an "Agreement to Provide Services" the parties drafted (but did not sign) in December 2001, which "was intended to be a short-term arrangement that would be replaced by a long-term contract between the parties." *Kargo I*, 2008 WL 45779758, at *1. The monthly hosting fee of $6,868 specified in the Term Sheet, and included in the three invoices, also appears in Ex. B to the draft long-term Agreement which, as noted, was never signed by Pegaso. Section 4.4 of that draft long-term Agreement reads:

> **Integration Discount.** Licensee [Pegaso] expressly acknowledges that the fee Licensor [Kargo] is charging Licensee for Licensee's limited right to use the Licensor patents, as well as the fee Licensor is charging for the initial integration services as described in Exhibit A is substantially below the market value of these services. Licensee further acknowledges that Licensor has offered these discounts because it regards Licensee as a premier customer and Licensor has agreed to the discounted fee in reliance on the expected benefit of the revenues to be generated during the full term of the Agreement.

This language, obviously written by Kargo, underlies the Court's statement in *Kargo I* that "Kargo claims that the rates used in the invoices were well below the market value of the services rendered (and that these discounted rates were provided in the expectation of a long-term contract)."

---

[5] This third invoice was preceded by an invoice dated September 18, 2002, in the slightly higher amount of $39,137.01. The revised September 19 invoice was submitted on a Kargo invoice form.

11

y

In these circumstances, Pegaso cannot be heard to say that the rates Kargo charged in its invoices establish the reasonable value of its services as a matter of law. That reasonable value may, as the Second Circuit said in *Longo*, be more than, less than, or the same as the invoiced rate. Kargo is entitled to a trial on the issue. Accordingly, Pegaso's cross-motion for a summary disposition will be denied.[6]

## IV. CONCLUSION

For the foregoing reasons, the motion of plaintiff Kargo for reconsideration of the Court's October 14, 2008 Memorandum Opinion and Order is DENIED.

The cross-motion of defendant Pegaso for reconsideration of that Memorandum Opinion and Order is also DENIED.

It is SO ORDERED.

Dated: New York, New York
May 11, 2009

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

---

[6] It should be noted, perhaps unnecessarily, that Kargo's *quantum meruit* claim covers only the period during which it actually rendered services to Pegaso, from December 2001 though September 2002. Kargo's services to Pegaso were terminated on September 30, 2002, and no *quantum meruit* claim can accrue after that date.

12